# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

_____

ANIMAL PROTECTION OF NEW MEXICO, INC.
and DEFENDERS OF WILDLIFE, INC.,

              **Plaintiffs-Appellants,**

v.                                     **CIV. No.  98-538 JP/LFG**

**UNITED STATES OF AMERICA, et al.,**

              **Defendants--Appellees.**

## MEMORANDUM OPINION AND ORDER

On April 2, 1999, Plaintiffs Animal Protection of New Mexico, Inc. and Defenders of Wildlife, Inc. filed a motion for summary judgment[1] (Doc. No. 19) under Fed. R. Civ. P. 56. After carefully considering the pleadings and the applicable law, I have determined that Plaintiff's motion should be granted in part and denied in part.

## I.      BACKGROUND

Cougars once roamed throughout New Mexico.[2]  During the period of modern settlement, however, unregulated killing and organized predator control severely reduced cougar populations

---

[1] Although Plaintiffs' motion is styled as a motion for summary judgment, the court must treat it as an appellate brief on the merits.  *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1579-80 (10th Cir. 1994) (holding that judicial review of agency action under the APA must be processed as an appeal governed by the Federal Rules of Appellate Procedure, not as a motion for summary judgment); *see also Baca v. King*, 92 F.3d 1031, 1034 n. 1 (10th Cir. 1996); *Wyoming Farm Bureau Federation v. Babbitt*, 987 F. Supp. 1349, 1353 n. 1 (D.Wyo. 1997).

[2] Cougars are also known as mountain lions, American lions, catamounts, panthers, and pumas.

in New Mexico. By the 1940's, cougars were confined to the mountains west of the Rio Grande river. In 1971, cougars were placed on New Mexico's list of protected species and the New Mexico Department of Game and Fish ("NMGF") assumed management authority over the cougars.

Defendant U.S. Department of Agriculture, Animal and Plant Health Inspection Service, Wildlife Services ("WS")[3] responds to various requests from individuals, organizations, and agencies experiencing damage caused by wildlife. New Mexico is divided into three WS districts: Albuquerque, Las Cruces, and Roswell. In each district, WS operates a predator damage management program, which is the program at issue in this lawsuit.

Under a Joint Powers Agreement between Defendant WS and NMGF, WS is authorized to respond to livestock damage caused by cougars with lethal means. From fiscal year 1990 through 1996, WS killed an average of seven mountain lions in the entire state per year; the maximum killed in any one year was eleven. (Roswell EA, at 4-13.) Since 1989, the annual statewide sport harvest rate of cougars has ranged from 105 to 150. *See id.* at 4-13 to 4-14. Cougars are also killed throughout New Mexico by NMGF through its authorized preventive control program. *Id.*

In 1997, WS worked with a number of state and federal agencies, including Defendant United States Department of Agriculture, Forest Service and Defendant United States Department of the Interior, Bureau of Land Management, to prepare an Environmental Assessment ("EA") and Findings of No Significant Impact ("FONSI") for the predator damage

---

[3] This agency was formally known as "Animal Damage Control."

management programs operating in each of the three WS districts.[4]  Each EA references

information contained in a nationwide Final Environmental Impact Statement for the Animal

Damage Control Program ("FEIS"), which was last updated in 1994.  The Albuquerque, Las

Cruces and Roswell FONSIs also refer to a 1996 report prepared by Logan, et al. ("Logan

report"), which was based on a ten year study of cougars in New Mexico.  In April 1998, WS

issued an updated monitoring report and FONSI for each district, again finding that the predator

damage management program had no significant effect on the human environment.

Plaintiffs Animal Protection of New Mexico, Inc., and Defenders of Wildlife, Inc., allege

that Defendants violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et.*

*seq.,* and its regulations by preparing inadequate EAs and FONSIs and, as a result, by failing to

prepare a required Environmental Impact Statement ("EIS").  Because NEPA does not provide a

private cause of action, Plaintiffs' claim arises under the APA.  *See Committee to Save the Rio*

*Hondo v. Lucero*, 102 F.3d 445, 448 (10th Cir. 1996).

## II.    STANDARD OF REVIEW

The parties appear to disagree over the standard of review.  Although it is somewhat

unclear, Plaintiffs seem to suggest that in the Tenth Circuit the reasonableness standard governs

the review of an agency's initial decision to forego an EIS.  *See* Reply at 7 (citing *Park County*

*Resource Council, Inc. v. United States Dep't of Agric.*, 817 F.2d 609 (10th Cir. 1987) (applying

---

[4] Apparently, WS was not required to prepare the EAs because "individual [predator damage management] actions are normally categorically excluded from the requirement to prepare an EA or EIS," (Albuquerque FONSI at 1; Las Cruces FONSI at 1; Roswell FONSI at 1.)  Nevertheless, WS elected to prepare an EA in order to determine if the predator damage management program might have any potentially significant impacts on the human environment. *See id*.

reasonableness standard to decision to forego EIS), *overruled by Village of Los Ranchos de Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir.), *cert. denied*, 506 U.S. 817 (1992)) and *Sierra Club v. Lujan*, 949 F.2d 362, 368 (10th Cir. 1991) (applying arbitrary and capricious standard under unique facts of case, but stating that such a decision was not a departure from *Park County*)).  Defendants argue that the deferential arbitrary and capricious standard applies.  *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575 (10th Cir. 1994).

The Tenth Circuit has unequivocally stated, "the appropriate standard for reviewing an agency's determination that a proposed project will not have environmental impact significant enough to require an EIS is the arbitrary and capricious standard of 5 U.S.C. § 706(2)(A)." *Los Ranchos*, 956 F.2d at 972.  In *Los Ranchos*, the Tenth Circuit discussed the Supreme Court's opinion in *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989), which held that the standard of review for an agency's decision not to prepare a supplemental EIS was arbitrary and capricious.  *See Los Ranchos*, 956 F.2d at 972.[5]  Concluding that *Marsh*'s reasoning was "equally applicable to an agency's initial decision that a project will not have significant environmental impact," the Tenth Circuit held that it was "preferable to use the arbitrary and capricious standard to review an agency's determination of the necessity of both an initial and a supplemental EIS, at least where the issue is whether the project will have a significant environmental impact."  *Id*. at 972-73 (citation omitted).  Finally, the court explicitly overruled *Park County*, 817 F.2d at 621, to the extent that it held that a reasonableness standard of review

---

[5] In *Marsh*, the Supreme Court stated that review of an agency's determination that an EIS need not be supplemented was primarily a factual inquiry.  *Marsh*, 490 U.S. 376-77.  The Court went on to state, "the decision whether to prepare a supplemental EIS is similar to the decision whether to prepare an EIS in the first instance."  *Id*. at 374.

should be followed. *Los Ranchos*, 956 F.2d at 973.[6] Here, Plaintiffs challenge Defendants'
determination that it was unnecessary to prepare an EIS because the predator damage
management program did not have significant effects on environment. Therefore, under *Los
Ranchos*, the proper standard of review is arbitrary and capricious.

"The duty of a court reviewing agency action under the 'arbitrary and capricious'
standard is to ascertain whether the agency examined the relevant data and articulated a rational
connection between the facts found and the decision made." *Olenhouse*, 42 F.3d at 1574
(footnote and citation omitted). The burden of proof is on the plaintiff. *See McKinley v. United
States*, 828 F. Supp. 888, 892 (D.N.M. 1993). "Agency action will be set aside 'if the agency
relied on factors which Congress has not intended for it to consider, entirely failed to consider an
important aspect of the problem, offered an explanation for its decision that runs counter to the
evidence before the agency, or is so implausible that it could not be ascribed to a difference in
view or the product of agency expertise.'" *Olenhouse*, 42 F.3d at 1574 (citing *Motor Vehicle
Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983)). Instead of focusing on the
rationality of the decision itself, the arbitrary and capricious standard focuses on the rationality of
an agency's decisionmaking process. *Id*. at 1575. Informal agency action "will be set aside as
arbitrary if it is unsupported by 'substantial evidence.'" *Id*.

---

[6] The Supreme Court has stated that "the difference between the 'arbitrary and capricious'
and 'reasonableness' standards is not of great pragmatic consequences." *Marsh*, 490 U.S. at 377
n. 23. Application of the 'reasonableness' standard would not change the outcome of this opinion.

Finally, in evaluating an agency decision to forego an EIS, the district court must consider any mitigating measures Defendants have undertaken. *See Park County*, 817 F.2d at 621, *overruled on other grounds by Los Ranchos*, 956 F.2d at 972.

## III. DISCUSSION

The primary issues to be decided are whether the Defendants' preparation of the 1997 EAs, 1997 FONSIs, 1998 Monitoring reports, and 1998 FONSIs ("NEPA documents") was arbitrary and capricious and therefore in violation of NEPA and whether NEPA requires that Defendants prepare an EIS for each district.[7] A secondary issue raised by the parties' briefs is whether the record should be supplemented to include three letters not presently included in the administrative record. After careful consideration, I conclude that the three letters should be considered and that the preparation of the NEPA documents was arbitrary and capricious. However, I also find that there is insufficient evidence to conclude that the Defendants' failure to prepare an EIS for each of the three districts was arbitrary and capricious.

### A. Dr. Logan's letters

Defendants argue that three letters, which are attached to Plaintiffs' memorandum and reply, cannot be considered because they are not part of the administrative record. Each of the three letters was written by Dr. Logan, who helped to prepare the Logan report. The three letters

---

[7] Plaintiffs' briefs tend to blur the issues of whether the EA was inadequate and whether an EIS must be prepared. Although the question of whether an EA is adequate overlaps somewhat with the question of whether an agency should have prepared an EIS, a court can remand to an agency to reconsider its FONSI if the court finds that an EA was inadequate, but a court can only require an agency to prepare an EIS "if it finds that the project may have a significant effect on the human environment." *Fritiofson v. Alexander*, 772 F.2d 1225, 1248 (5th Cir. 1985), *abrogated on other grounds, Sabine River Auth. v. United States Dep't of Interior*, 951 F.2d 669 (5th Cir.1992), *cert. denied*, 506 U.S. 823 (1992).

are: 1.) a letter dated May 20, 1998, written by Dr. Logan to Alex Larra of WS stating that the

FONSI for the Las Cruces WS district reflected misunderstandings regarding the Logan report

(Ex. A to Plaintiffs' Memo.); 2.) a letter dated April 18, 1997, from Dr. Logan to Elisabeth

Jennings of Sangre de Cristo Animal Protection, Inc. criticizing the Roswell EA's reliance on the

Ashman & Robinette studies on cougar populations (Ex. 1 to Reply); and 3.) a letter dated May

6, 1997, from Dr. Logan to Elisabeth Jennings of Sangre de Cristo Animal Protection, Inc.

commenting on the 1994 FEIS and the 1997 FONSI for the Roswell district (Ex. 2 to Reply).

Judicial review of agency action is generally confined to the administrative record.  *See*

*Franklin Savings Assoc. v. Director, Office of Thrift Supervision*, 934 F.2d 1127, 1137 (10th Cir.

1991), *cert. denied*, 503 U.S. 937 (1992).  However, "[s]ome circuits seem to accept extra-record

evidence in NEPA cases almost as a matter of course."  Susannah T. French, *Judicial Review of*

*the Administrative Record in NEPA Litigation*, 81 Cal. L. Rev. 929, 952 (1993).  The Tenth

Circuit is one of the circuits that has regularly considered extra-record evidence in NEPA cases.[8]

*Id*.  A court may consider such evidence if one of the three following exceptions applies:

_____

[8] *See* Susannah T. French, *Judicial Review of the Administrative Record in NEPA Litigation*, 81 Cal. L. Rev. 929, 952 n. 158 (1993) (citing *Sierra Club v. Hodel*, 848 F.2d 1068, 1090 n.17 (10th Cir. 1988) (noting that the district court's conclusions were based on "evidence and testimony adduced at trial"), *overruled on other grounds by Los Ranchos*, 956 F.2d 970; *Park County*, 817 F.2d 609, 614 (referring to the willingness of the district court to hear the testimony of eleven witnesses at  a consolidated hearing and trial), *overruled on other grounds by Los Ranchos*, 956 F.2d 970; *Colorado Envtl. Coalition v. Lujan*, 803 F. Supp. 364, 370-71 (D. Colo. 1992) (allowing plaintiffs to introduce testimony from a geological expert); *Citizens for Envtl. Quality v. United States*, 731 F. Supp. 970, 982-83 (D. Colo. 1989) (admitting expert affidavit to help the court to understand "the complex issues" presented by the case and to "illuminate the information contained in the administrative record"); *Oklahoma Wildlife Fed'n v. United States Army Corps of Eng'rs*, 681 F. Supp. 1470, 1489 (N.D. Okla. 1988) (allowing limited oral testimony on environmental and ecological impacts to "determine if there were significant oversights by the [agency] in its investigation")).

[1] Where the administrative record fails to disclose the factors considered by the agency, a reviewing court may require additional findings or testimony from agency officials to determine if the action was justified, *Overton*, 401 U.S. at 420, 91 S.Ct. at 825; or [2] where necessary for background information or for determining whether the agency considered all relevant factors including evidence contrary to the agency's position, *Thompson v. United States Dept. of Labor*, 885 F.2d 551, 555 (9th Cir.1989); or [3] where necessary to explain technical terms or complex subject matter involved in the action, *Animal Defense Council v. Hodel*, 867 F.2d 1244, 1244 (9th Cir.1989), and *Animal Defense Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir.1988).

*Franklin Savings*, 934 F.2d at 1137-38.

Although these letters were not considered by Defendants while preparing the EAs, FONSIs, or monitoring reports, I will consider them for the limited purpose of "determining whether the agency considered all relevant factors including evidence contrary to the agency's position." *Franklin Savings*, 934 F.2d at 1137 (citation omitted). The voluminous administrative record and the length of the Logan report,[9] which is 279 pages, coupled with the technical and specialized nature of the issues raised here, makes consideration of the letters "necessary to explain technical terms or complex subject matter involved in the action." *Id*. at 1137 (citation omitted).

---

[9] Although the Logan report was not included in the administrative record, Defendants cited to it in the EAs and FONSIs, and I requested that the parties submit a copy of it to the court. *See Franklin*, 934 F.2d at 1137 (holding that a court may consider extra-record evidence in a NEPA case "where necessary for background information or for determining whether the agency considered all relevant factors including evidence contrary to the agency's position") (citation omitted); *see also Friends of the Payette v. Horseshoe Bend Hydroelectric Co.*, 988 F.2d 989, 997 (9th Cir. 1993) ("The district court may also look outside the record when the agency has relied on documents not in the record and when supplementing the record is necessary to explain technical terms or complex subject matter.") (citation omitted).

### B.     NEPA Compliance

Plaintiffs contend that Defendants violated NEPA and its regulations by failing to prepare adequate EAs and related FONSIs and by also failing to prepare required EISs. Defendants deny that their actions violated NEPA. An evaluation of the parties' arguments requires a review of Defendants' obligations under NEPA and an assiduous examination of the administrative record.

### 1.     NEPA

The National Environmental Policy Act of 1969 ("NEPA") created a national policy to "encourage productive and enjoyable harmony between man and his environment." 42 U.S.C. § 4321. NEPA requires agencies to take a "hard look" at the environmental consequences of a proposed action. *See Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21 (1976).

Under NEPA, an agency must prepare an EA when required under the procedures adopted by the individual agency, *see* 40 C.F.R. § 1501.3(a), and may prepare one to assist in agency planning and decisionmaking. *See* 40 C.F.R. § 1501.3(b). The EA serves to "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1). The EA must contain brief discussion of the need for the proposed action, alternatives, and a listing of agencies and persons consulted during the assessment period. *See* 40 C.F.R. § 1508.9(b).

 If an agency determines that an action will not have a significant effect on the environment, then it prepares a FONSI. *See* 40 C.F.R. § 1508.13. If, on the other hand, the agency determines that the action will have a significant effect on the environment, then it prepares an EIS. *See id.* A FONSI, which is the product of informal agency decision making, is a "document . . . briefly presenting the reasons why an action . . . will not have a significant effect

on the human environment and for which an environmental impact statement therefore will not be prepared." 40 C.F.R. § 1508.13. Either the EA or a summary of it must be included in the FONSI. *See id.*

An agency must prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). "Major reinforces but does not have a meaning independent of significantly [ ]." 40 C.F.R. § 1508.18. "Significantly" requires consideration of whether the "degree to which the effects on the quality of the human environment are likely to be highly controversial," 40 C.F.R. § 1508.27(b)(4), "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," 40 C.F.R. § 1508.27(b)(5), and "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. §1508.27(b)(7). "*Cumulative impact* is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7 (emphasis in original).

> ## 2. *Administrative Record*
>
> ### a. EAs, FONSIs, and Monitoring Reports

Defendants prepared an EA for each district to evaluate any potential significant impacts on the human environment caused by the proposed predator damage management program. Each EA considers a number of alternatives and eventually selects the "no-action" alternative, which consists of continuing the current predator damage management program. All of the 1997 EAs rely on studies done in other states to estimate that cougar density is approximately 3 per 100

square miles.  (Albuquerque EA at 2-7, Las Cruces EA at 2-7, Roswell EA at 2-8.)  Based on this figure, and an approximation of how many square miles of each district is suitable cougar habitat,[10] the EAs estimate that the Albuquerque district has 1600 cougars, (Albuquerque EA at 2-7), that the Las Cruces district has 1080, (Las Cruces EA at 2-7), and that the Roswell district has 260, (Roswell EA at 2-8).  The Albuquerque and Las Cruces EAs state, "[a]lthough the NMGF does not have estimates of mountain lion populations, they believe that these populations are stable in the state." (Albuquerque EA at 2-7, Las Cruces EA at 2-7.)  The Roswell EA states, "[t]he NMGF believes mountain lion populations are stable in the state." (Roswell EA at 2-7.) The Roswell EA also cites to a personal comment made by Dr. Logan estimating that there are 1,270 cougars in the entire state.  *Id*. at 2-8.

> The EAs rely on out-of-state studies and the FEIS, which itself relies on out-of-state studies, to determine the sustainable harvest rate, which is the rate at which cougars can be harvested, i.e., killed, without reducing the population.  According to these studies and the FEIS, estimates of the sustainable harvest rate ranges from 30% to 50%.  The EAs utilize the 30% sustainable harvest rate projected in the FEIS to calculate whether the predator damage management program is causing any adverse effect on the cougar population.  (Albuquerque EA at 4-13, Las Cruces EA at 4-13, Roswell EA at 4-13.)  The EAs also tally the number of cougars killed by all sources in 1994 and 1995.  *Id*.

---

[10] Defendants apparently relied on NMGF to supply an estimate of the suitable habitat for cougars.  In a letter from NMGF employee Darrel Weybirght to the environmental coordinator of WS, Weybright provided a map of suitable cougar habitat and stated that his estimates of suitable cougar habitat "is based on my best guess, conversations with field officers and game managers, sport harvest records, and knowledge of the species."  (August 20, 1996 Weybright letter, Albuquerque General Correspondence.)

No cougars were killed by WS in the Albuquerque district in 1994 or 1995, although a total of 82 cougars were killed by other sources in 1994 to 1995.  (Albuquerque EA at 4-13.) The Albuquerque EA states that WS estimates the maximum take it would have in any one year would be no more than 10 and that the cumulative take from all sources should not exceed 150 in any year.  *Id*.  Based on the population estimate of 1,600, the EA estimates that WS' take would never exceed .6 % of the total population and that the maximum cumulative take from all sources would not exceed 10% of the estimated population.  *Id*.  Therefore, the EA concludes, "no significant cumulative effect on the mountain lion population is expected to occur under the current [predator damage management] program."  *Id*.  The EA adds that if the situation changes, NMGF could impose harvest and take restrictions that WS would be bound to follow.  *Id*.

From 1994-95, WS killed a total of four cougars in the Las Cruces district and 105 were killed as a result of private harvest.  (Las Cruces EA at 4-13.)  The Las Cruces EA states that the maximum take it would have in any one year would be no more than 10.  *Id*. and that WS' current take was, at most, only 2-4% of the total take.  *Id*.  Based on the population estimate of 1,080, the Las Cruces EA estimates that WS' take would never exceed .9 % of the population and that the maximum cumulative take from all sources would not exceed 11% of the estimated population.  *Id*. at 4-14.  Therefore, the Las Cruces EA concludes, "no significant cumulative adverse effect on the mountain lion population is expected to occur under the current [predator damage management] program."  *Id*.  The Las Cruces EA adds that if the situation changes, NMGF could impose harvest and take restrictions that WS would be bound to follow.  *Id*.

In the Roswell district, six cougars were killed by WS in 1994 and 2 were killed in 1995. Roswell EA at 4-13).  Combined with hunting and NMGF preventative takes, a total of 15

cougars were harvested in Roswell in 1994 and 11 were harvested in 1995. *Id*. Using the 260 population estimate and the 30% FEIS estimate for the sustainable harvest rate, the Roswell EA concludes that WS' take has represented only 3% of the total population and that the maximum harvest rate, based on all takings, has been only 6% of the total population, which is just 1/5 of the 30% sustainable harvest level. *Id*.

All of the 1997 FONSIs address the Logan report. (Albuquerque FONSI at 8, Las Cruces FONSI at 9, Roswell FONSI at 7.). The Albuquerque and Las Cruces FONSIs state that, even if Logan's population estimate of 1,270 is correct, the total maximum number of takes in the state each year, which is 180, represents only 14% of the total population. (Albuquerque FONSI at 8, Las Cruces FONSI at 9.) Based on a sustainable harvest rate of 30%, the EAs conclude that the cumulative take is well under that figure and that WS' take represents only 4-6% of the total. *Id*.

The Roswell FONSI addresses a comment that "the EA ignores more current data on mountain lions in New Mexico which suggests that only an 8% harvest level is the sustainable annual harvest level." (Roswell FONSI at 7.) In response, the FONSI states that the Logan report "recommended using 8% as an initial maximum harvest rate for male lions if sustained harvest was desired," but that the report also suggested "that for populations managed for control, annual kill rates for adult mountain lions may need to exceed 28% which is the maximum rate of increase they observed in another portion of their study area in which they removed lions to simulate hunting/control mortality." *Id*. Therefore, the FONSI concludes, the "mountain lion populations can potentially withstand (or *sustain*) an annual harvest level equal to 28%, which is close to the 30% sustainable harvest level determined in the ADC FEIS." *Id*. (emphasis in original).

13

The 1998 monitoring reports and FONSIs for the three districts tally the total WS kills in each district during 1997 and cite Kerry Mowrer's comment that the cougar population is stable. Based on NMGF's estimate that there are between 1500 and 2,600 cougars, the 1998 monitoring reports and FONSIs estimate what percentage of the state's population of cougars is in each district. They then cite the Logan report for the proposition that the sustainable harvest rate is 28% and conclude that the cumulative take in each district for 1997, as a percentage of the total cougar population, was well below 28%. (Albuquerque 1998 monitoring report and FONSI at 3-4; Las Cruces 1998 monitoring report and FONSI at 3-4; Roswell 1998 monitoring report and FONSI at 3-4).[11]

b.    Logan Report

After controversy erupted in 1983 and 1984 regarding cougar management in New Mexico, NMGF contracted the Hornocker Wildlife Institute to study the ecology of cougars. Together with the State Game Commission, NMGF supported the Logan report, which is a ten year study of cougars in the San Andres Mountains ("SAM") in southern New Mexico. The SAM is located almost entirely within the White Sands Missile Range. Researches divided the study area into two sections. In the Treatment Area ("TA"), researchers experimentally removed some of the cougars, which lowered the population density, to study survival rates. (Logan report at 8.) In the Research Area ("RA"), no manipulation of the cougar population occurred. *Id*.

The Logan report makes a number of findings, including the exponential rate of increase in

---

[11] In 1997 WS killed no cougars in the Albuquerque district; in the same year, WS killed three cougars in the Las Cruces district and six in the Roswell district.

adult cougars from year to year.  In the RA, the adult cougar population increased at a rate of

11% per year from 1989 to 1995.  (Logan report at Fig. 3.10.)  During the years 1989 to 1992,

the increase was 17% while the increase from 1992 to 1995 was only 5%.  *Id.*  In the TA, where

some cougars had been removed from the study area and there was a lower density of cougars,

the rate of increase from 1988 to 1991 was 21% and the rate of increase from 1992 until 1995

was 28%.  (Logan report at Fig. 3.9.)  The Logan report warns against blind reliance on these

figures:

> The rates of increase of adult cougars on the SAM may be
> considered as reference rates of increase in other cougar
> populations in New Mexico; however, those numbers should be
> used with caution.  Almost all other cougar populations in New
> Mexico are hunted and/or probably have higher rates of other
> human-caused mortality (e.g., predator control, illegal killing, road
> mortalities) than the SAM population; therefore, *actual rates of
> increase in those populations are probably lower, zero, or
> negative.*

*Id.* at 73-74.

The Logan report also states,"[i]f the objective is sustained harvest, we recommend using

the observed exponential rates of increase that we calculated for the RA as initial maximum

harvest rates.  Annual harvest should not exceed 8% of the adult males and the harvest of females

should be strictly controlled [ ]."  *Id.* at 74.  The report goes on to state, "[f]or cougar

populations managed for control, the annual kill rates for adult cougars may have to exceed the

maximum rate of increase we observed in the TA (0.28)."  *Id.*

<u>c.</u>      Dr. Logan's letters

Dr. Logan's letters discuss what he perceives to be inadequacies in the NEPA documents

and their misinterpretation of the Logan report.  The April 1997 letter, which concerns the

Roswell EA, criticizes the studies upon which Defendants relied in preparing the NEPA documents and reiterates that "there are no data that would indicate whether lions in New Mexico are increasing, stable, or declining." (April 1997 letter, Ex. 1 to Reply.) It also emphasizes that the Logan report found that the "*maximum* annual rates of increase for adults may range from 17 to 28% for lion populations that have been exploited, then protected" and "that rates of increase in adults are density dependent and may decline to zero where lion populations reach carrying capacity." *Id*. (emphasis added).

In the May 1997 letter, Dr. Logan asserts that the 30% sustainable harvest rate contained in the FEIS is based on unreliable studies. (May 1997 letter, Ex. 2 to Reply.) He concedes that WS' "level of taking may in itself have minimal effects on lion populations within the state," but states that "because there is no data on the number of mountain lions presently in New Mexico, no one knows what impact the total take is having on the lion population." *Id*.

In the May 1998 letter, Dr. Logan lays out what he considers to be "crucial misunderstandings regarding [WS's] interpretation" of the Logan report. (May 1998 letter, Ex. A to Memo.) He criticizes the Las Cruces EA for relying on a 28% sustainable harvest rate on the ground that "there is even more information in our final report indicating that sustainable harvest levels for mountains lions are less than 28% of adults." *Id*. He states that "[i]n reality, **the interpretation that a mountain lion population can sustain a harvest level of 28% of the adults is an extreme one**." *Id*. (emphasis in original). Dr. Logn emphasizes that the 28% rate was derived from the rate of increase of cougars in the TA *after* the population had been severely reduced and then protected in order to determine the potential maximum rate of population increase. *Id*. Explaining that the rate of increase of cougar populations is dependent on carrying

capacity and any drastic changes in the habitat, such as drought, Dr. Logan warns that "harvest rates that exceed 5 to 28% of the adult lion population may cause population declines."  *Id.*

### 3.    *Adequacy of the NEPA documents*

Plaintiffs contend that Defendants violated NEPA by failing to take a "hard look" at the impact of the predator damage management program on the cougar population and by failing to prepare an EIS.   The specific arguments Plaintiffs advance can be summarized as follows: 1.) Defendants failed to consider an important aspect of the problem by misinterpreting or ignoring the Logan report and by basing their conclusions on guesswork and flawed and outdated studies; 2.) the NEPA documents are improperly tiered to the FEIS, which itself contains outdated data; 3.) Defendants failed to consider the cumulative impact of the predator damage management program on the cougar populations; and 4.) Defendants were required to prepare an EIS because the effects of the predator damage management program on the human environment are highly controversial and the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

Defendants respond that they fully complied with NEPA by considering the Logan report in all of the FONSIs and that they are not required to accept the scientific conclusions contained in the Logan report.  *See McKinley v. United States*, 828 F. Supp. 888, 892 (D.N.M. 1993). Defendants further contend that the NEPA documents rely on valid studies and data and that they consider the cumulative effects of the predator damage management program on the cougar population.  Because the predator damage management program is responsible for only 4-6% of the total annual state-wide take of cougars, Defendants argue that the impact of the predator damage management program is *de minimis*.  Defendants also contend that the timing issue is

moot and that the NEPA documents were properly tiered to the FEIS, which was only relied upon for background information.

As discussed, *supra*, all three EAs base their estimate of the cougar population on a personal comment made by NMGF employee D. Weybright in 1996 regarding how many square miles in each district is considered suitable for cougar habitat. (Albuquerque EA at 2-7, Las Cruces EA at 2-7, Roswell EA at 2-8.) None of the EAs state when or where Weybright made this personal comment, although the administrative record contains a letter and an attached map from Weybright to the environmental supervisor of WS providing estimates of suitable cougar habitat in New Mexico. (August 20, 1996 Weybright letter, Albuquerque General Correspondence.) In the letter, Weybright states that "this information is based on my *best guess*, conversations with field officers and game managers, sport harvest records, and knowledge of the species." *Id.* (emphasis added). He also states that cougars "establish territories that are affected by food sources, which in turn, are affected by weather patterns, and have transient segments of their populations," which "yields an *ever-changing population*." *Id.* (emphasis added).

Based on Weybright's estimates of suitable cougar habitat, which he concedes are based partly on guesswork, and a study done by Johnson & Strickland (1992) estimating that cougar density in western states is about 7.5 per 100 square miles, the EAs make a guess at what the cougar population in New Mexico might be. Professing to err on the side of the cougars, the EAs assume cougar density of only 3 per 100 square miles, or approximately half of what Johnson & Strickland (1992) had estimated it to be. *Id*. (Albuquerque EA at 2-7, Las Cruces EA at 2-7, Roswell EA at 2-8.)

The Albuquerque, Las Cruces, and Roswell EAs also state that NMGF believes the cougar

population is stable. (Albuquerque EA at 2-7, Las Cruces EA at 2-7.) To support this statement, the EAs cite to a personal comment made by NMGF employee Kerry Mower. Nothing in the EAs, however, reveal the data, study, or other scientific source of Mowrer's conclusory comment. Nor have Defendants pointed to any scientific study contained in the administrative record that might support Mowrer's unsubstantiated comment. A review of the NEPA documents therefore reveals that the cougar population is unknown. The Logan report confirms this when it states, "[u]nfortunately, *cougar numbers* and effects of present cougar management in New Mexico *are not known*." (Logan report at 74, emphasis added)

Defendants' conclusion that the predator damage management program will not have any significant effects on the environment appears to be based on "assumptions, presumptions, or conclusions themselves--not facts based on any evidence, documents, or data in the Administrative Record." *Sierra Club v. Babbitt*, 15 F. Supp. 2d 1274, 1283 (S.D.Ala. 1998). In *Sierra Club*, environmental plaintiffs challenged the Fish & Wildlife Service's ("FW's") issuance of a FONSI and failure to prepare an EIS regarding two incidental take permits ("ITPs") for construction of two housing complexes in the habitat of the endangered Alabama Beach Mouse ("ABM"). *See id.* at 1275. Having reviewed the record, the court concluded that it clearly established "that the FWS's determination of no significant impact is based on insufficient,

inaccurate, old and out of date data." *Id*. at 1284. The court noted that FWS lacked "a

reasonably accurate, current estimation of the total number of ABM remaining throughout the

ABM's dwindling range" and that speculation regarding the population of the ABM ranged from

45 to 1,000. *Id*. at 1283. The court also stated:

> While it is unclear to the Court on what basis the findings of no
> significant impact were made, it is clear on what basis they were
> not. They are not made on the basis of population inventories in
> the project area. They are not made on the basis of population
> trend data for the species throughout its range. They are not made
> on the basis of any minimal viable population data. . . . Because the
> agency failed to consider important aspects of the problem and
> relied on insufficient, inadequate, and[ ] out of date data, it was
> arbitrary and capricious for the FWS to issue findings of no
> significant impact, and thus, in [sic] their action violated NEPA.

*Id*. at 1284. The court remanded to FWS and ordered it to "gather the necessary scientific data

and conduct the required scientific analysis in order to determine whether the issuance of the ITPs

will have a significant impact on the ABM or its critical habitat and thereby require the

preparation of an EIS for either or both projects." *Id*. at 1284-85.

In another district court opinion involving alleged NEPA violations, the court also

concluded that the defendant Forest Service's conclusion that seven timber projects would not

impact already declining populations of a sensitive species was arbitrary and capricious "because

the Defendant Forest Service does not appear to have facts or evidence, whether population data,

quantitative data, or any other type of adequate information, to support its findings of no

significant impact." *Sierra Club v. Martin*, --- F. Supp. 2d --- , 1996 WL 1163031, at *53

(N.D.Ga. 1996) (to be published). In reaching this conclusion, the court emphasized that it did

not necessarily disagree with the Forest Service's conclusions but found that "many of the

important 'facts' on which the Defendant Forest Service based its decisions appear to be assumptions, presumptions, or conclusions themselves--but not facts based on any evidence, documents, or data in the administrative record." *Id*. The court specifically noted that the Forest Service did not have population data about the sensitive species and had not even determined whether the sensitive species resided in each of the seven timber project sites. *Id*. at *54.

As in *Sierra v. Martin* and *Sierra v. Babbitt*, Defendants' "facts" regarding the cougar population and its stability appear to be based on assumptions and conclusions rather than reliable scientific data. Defendants nevertheless contend that the impact of the predator damage management program is insignificant because WS is only responsible for between seven and eleven cougars deaths each year in the entire state, which represents 4-6% of the known total number of cougars killed each year. Relying on the FEIS' 30% sustainable harvest rate,[12] the EAs all conclude that the cumulative take of cougars is far less than 30% of the cougar population and that WS' take of cougars represents just a fraction of the total percentage of cougars killed each year. Therefore, the EAs reason, the predator damage management program has no significant impact.

Defendants' reasoning is flawed in two crucial respects. First, as already discussed, the cougar population is unknown. Second, Defendants overlooked, or ignored, information contained in the Logan report suggesting that the sustainable harvest rate may be much lower than 30%. The 30% rate cited in the NEPA documents is based on studies by Robinette, et al. (1977) of cougars in Utah and Ashman, et al. (1983) of cougars in Nevada, (Albuquerque EA at 4-13;

---

[12] Although Plaintiffs have not specifically identified which parts of the NEPA documents they allege were improperly tiered to the FEIS, it appears that this objection is levied at the EAs' reliance on the 30% sustainable harvest level provided by the FEIS.

Las Cruces EA at 4-13; Roswell EA at 4-13), and the FEIS, which also uses a 30% sustainable harvest rate based on the Ashman, et al. (1983) study, (Albuquerque FONSI at 8; Las Cruces FONSI at 9; Roswell FONSI at 7; FEIS at 4-12). In contrast to the Robinette, et al. (1977) and the Ashman, et al. (1983) studies, the Logan report is a comprehensive a study of cougars in New Mexico completed just a year before the EAs were prepared. Common sense dictates that a long-term study of cougars in this state would provide more recent and relevant information regarding the sustainable harvest rate than studies done in other states more than sixteen years before Defendants prepared the NEPA documents at issue here.

Thus, although tiering is encouraged by NEPA,[13] tiering to the 1994 FEIS was inappropriate in this instance because Defendants had available to them new and relevant information contained in the 1996 Logan report regarding sustainable harvest rates that they failed to adequately consider. *See Glisson v. United States Forest Service*, 876 F. Supp. 1016, 1033 (S.D.Ill. 1993) (stating that although additional EISs do not need to be prepared for each site-specific project authorized by a Forest Plan when there is an EIS for the entire Forest Plan, "[c]ertain exceptions exist, such as where there are changed circumstances or *new information*."),

---

[13] The Council on Environmental Quality regulations that implement NEPA state, "[a]gencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review. Whenever a broad environmental impact statement has been prepared (such as a program or policy statement) and a subsequent statement or environmental assessment is then prepared on an action included within the entire program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action." § 40 C.F.R. 1502.20; *see also* § 1508.28 ("[t]iering is appropriate when the sequence of statements or analyses is: (a) From a program, plan, or policy environmental impact statement . . . to a site-specific statement of analysis.").

*aff'd*, 51 F.3d 275 (7th Cir. 1995).

While the Roswell EA and the Albuquerque, Las Cruces, and Roswell 1998 monitoring reports and FONSIs cite the Logan report for the proposition that the sustainable harvest rate is 28%, Defendants seem to have plucked from the Logan report the highest sustainable harvest rate mentioned without considering all of the data contained in the report, discussed *supra*, suggesting that the *maximum* sustainable harvest rate may be as high as 28%, but that, depending on the circumstances, actual rates of increase in the cougar population may be zero or negative. (Logan report at 73-74; May 1998 letter, Ex. A to Memo.) Defendants' fleeting consideration of the Logan report is devoid of any meaningful discussion of the various sustainable harvest rates set forth in the Logan report. *See Seattle Audubon Society v. Espy*, 998 F.2d 699, 704 (9th Cir. 1993) (stating that "[t]he EIS did not address in any meaningful way the various uncertainties surrounding the scientific evidence" and affirming the district court's ruling that preparation of the EIS, which relied on stale scientific evidence, violated NEPA). This omission lends further support to the conclusion that Defendants failed to consider an important aspect of the problem and that their actions were therefore arbitrary and capricious.

Because Defendants do not have an accurate estimate of the cougar population based on scientific data, because there is no data to support the EAs' assertion that the cougar population is stable, and because Defendants have failed to provide a satisfactory explanation of their utilization of the 28% or 30% sustainable harvest level, it is not possible to know whether the cougar population is actually declining in any of the three districts. If it is, any impact on the cougar population from the predator management program--even the deaths of seven to eleven cougars each year--could have a significant impact on the human environment. Although Defendants are

not required to accept the conclusions of the Logan report, *McKinley*, 828 F. Supp. at 892,

Defendants' cursory and arbitrary consideration of the Logan report supports the conclusion that

Defendants failed to take the requisite "hard look" at the predator damage management program.

Defendants' argument that "the agency has reasonably assumed that the cumulative effects

[of the predator damage management program] will be mitigated through NMGF's planned

control of hunting within the state," (Resp. at 20), is not also persuasive.[14]   The EAs all conclude

that the cumulative effect of killing cougars is not significant but state that if the situation

changes, NMGF could impose restrictions to ensure that the impact on the cougar population

remained within NMGF's goals for maintaining the population.  (Albuquerque EA at 4-13; Las

Cruces EA at 4-14; and Roswell EA at 4-13.)  This vague statement, which does not contain any

explicit promise from NMGF, provides an insufficient basis for finding that Defendants have

mitigated any adverse impacts of the predator damage management program.  *See Preservation*

*Coalition, Inc. v. Pierce*, 667 F.2d 851, 860 (9th Cir. 1982) (stating that when a mitigating action

"is to be undertaken by third parties, their commitments, while they need not be contractual, must

be more than mere vague statements of good intentions") (citation omitted).  Moreover, it

appears that NMGF, like Defendants, has no accurate estimate of the cougar population in New

Mexico.  Therefore, any reliance on NMGF's attempts to manage the cougar population suffer

from the same defect as Defendants' approach to its predator damage management program.

Having carefully reviewed the administrative record, the FEIS, the Logan report, and Dr.

---

[14] The Council on Environmental Quality has regulations addressing an agency's need to consider mitigation when preparing an EIS, 40 C.F.R. § 1502.16(h), but no regulations address an agency's need to consider mitigation when preparing a FONSI or an EA.  Nevertheless, the Tenth Circuit has considered mitigation measures in evaluating a FONSI.  *See Park County*, 817 F.2d at 621, *overruled on other grounds by Los Ranchos*, 956 F.2d 970.

Logan's three letters, I conclude that Defendants' finding that the predator damage management program will not have a significant effect on the human environment is arbitrary and capricious because Defendants failed to consider an important aspect of the problem--the actual cougar population in New Mexico--and because they failed to meaningfully consider the new and relevant information contained in the Logan report regarding the sustainable harvest rate of cougars. *See Olenhouse*, 42 F.3d at 1574; *Sierra Club v. Babbitt*, 15 F. Supp. 2d at 1284; *Sierra Club v. Martin*, --- F. Supp. 2d --- , 1996 WL 1163031, at *54.

### 4.    *Need to prepare EIS*

In addition to arguing that the EAs and FONSIs were inadequate, Plaintiffs contend that NEPA required Defendants to prepare EISs for each of the three districts because the predator damage management program is a major Federal action significantly affecting the quality of the human environment. *See* 42 U.S.C. § 4332.   Plaintiffs point to several of the regulations promulgated by the Council of Environmental Quality discussing what factors should be considered in determining whether an action "significantly" affects the human environment. *See* 40 C.F.R. § 1508.27.

Consideration of "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial," 40 C.F.R. § 1508.27(b)(4), does not, as Plaintiffs suggest, mandate that Defendants prepare an EIS for the predator damage management program.  Although Dr. Logan's letters and the Logan report reveal opposition to the predator damage management program, the existence of opposition to a project is not tantamount to a finding that an action is controversial. *See Rucker v. Willis*, 484 F.2d 158, 162 (4th Cir.1973); *see also Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998)

("We have held that 'controversial' is 'a substantial dispute [about] the size, nature, or effect of the major Federal action rather than the existence of opposition to a use.'") (citation omitted), *cert. denied*, --- U.S. --- , 119 S.Ct. 2337 (1999). Because Plaintiffs have not demonstrated that there is a "substantial dispute" about the predator damage management program, as opposed to mere opposition to it, Defendants' failure to prepare an EIS did not violate NEPA.

Plaintiffs also appear to argue that Defendants should have prepared an EIS because "the possible effects on the human environment are highly uncertain or involve unique or unknown risks," 40 C.F.R. § 1508.27(b)(5), and because "the action is related to other actions with individually insignificant but cumulatively significant impacts," 40 C.F.R. § 1508.27(b)(7). Without more accurate information regarding the cougar population in New Mexico and a more thorough discussion of the sustainable harvest rate, however, it is impossible to determine whether consideration of these factors dictates the conclusion that the predator damage management program "significantly" affects the quality of the human environment. Because there has not been a showing that the predator damage management program may have a significant effect on the human environment, Defendants will not at this time be required to prepare EISs on the predator damage management program. *See Fritiofson v. Alexander*, 772 F.2d 1225, 1248 (5th Cir. 1985) (stating that a court can only require an agency to prepare an EIS "if it finds that the project may have a significant effect on the human environment"), *abrogated on other grounds, Sabine River Auth. v. United States Dep't of Interior*, 951 F.2d 669 (5th Cir.1992), *cert. denied*, 506 U.S. 823 (1992).

5. *Timing*

Finally, Plaintiffs contend that the NEPA documents were not timely prepared because the predator damage management program was "already well under way when by the time the first EAs were prepared." (Memo. at 15.) Because the documents have now been prepared, this issue is moot. Moreover, the predator damage management program has been an ongoing project for a number of years and the regulations of the Council on Environmental Quality suggest that an ongoing program may continue while the agency contemplates various alternatives, including a "no action" alternative, which specifically contemplates continuation of ongoing programs. *See* NEPA's Forty Most Asked Questions, 46 Fed. Reg. 18026, Question 3 (1981).

IV. **CONCLUSION**

Because Defendants failed to consider an important aspect of the predator damage management program--the cougar population--and failed to address in a meaningful way the information contained in the Logan report regarding the sustainable harvest rate, Defendants' actions were arbitrary and capricious and therefore in violation of NEPA. *See Olenhouse*, 42 F.3d at 1574; 40 C.F.R. § 1508.9(a)(1) (stating that an EA provides "sufficient evidence and analysis for determining whether to prepare an environmental impact statement or finding of no significant impact). However, Plaintiffs have not shown that the predator damage management program has had a significant effect on the human environment, which would require the preparation of an EIS. Therefore, on remand Defendants "must gather the necessary scientific data and conduct the required scientific analysis" *Sierra Club*, 15 F. Supp. 2d at 1284, to determine whether the predator damage management program will have a significant effect on the human environment.

IT IS THEREFORE ORDERED that:

1.      this case is remanded to WS in order to allow it to conduct the appropriate analysis of the predator damage management program in an EA that complies with NEPA; and

2.      Plaintiffs' request that WS be enjoined from killing cougars in New Mexico and be ordered to prepare an EIS is denied at this time.


_____
**UNITED STATES DISTRICT JUDGE**