IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

---

**ANIMAL PROTECTION OF NEW MEXICO, INC.
and DEFENDERS OF WILDLIFE, INC.,**

        **Plaintiffs-Appellants,**

**v.**                                            **CIV. No.  98-538 JP/LFG**

**UNITED STATES OF AMERICA, et al.,**

        **Defendants--Appellees.**

## MEMORANDUM OPINION AND ORDER

On May 26, 2000 Plaintiffs filed a Motion for Attorneys' Fees and Expenses Pursuant to the Equal Access to Justice Act, (Doc. No. 27).  Having carefully reviewed the briefs and the applicable law, I conclude that the motion should be granted in part.

## BACKGROUND

On May 6, 1998 Plaintiffs filed this lawsuit under the Administrative Procedures Act ("APA"), 5 U.S.C. § 706(2)(A), and the National Environmental Procedures Act ("NEPA"), 42 U.S.C. § 4321, *et. seq.* Plaintiffs alleged that Defendants' preparation of several Environmental Assessments ("EAs") and Findings of No Significant Impact ("FONSIs") violated NEPA. Plaintiffs argued that Defendants acted arbitrarily and capriciously by concluding that the predator damage management program, which authorized the killing of some cougars, would not have a significant impact on the human environment. Plaintiffs' complaint requested a declaration that Defendants had violated NEPA; that the Court enjoin the Defendants from "tiering the analysis of cumulative environmental impacts for [Wildlife Service's] proposed and ongoing activities with regard to the cougar in the State of New Mexico to the programmatic EIS"; that the Court order Defendants to prepare an adequate EA and, if necessary, an environmental impact statement ("EIS"); and that the Court enjoin the Defendants from killing any cougars until Defendants complied with NEPA by preparing an adequate EA or EIS.[1]  (Compl. at 21-23.)

In a January 10, 2000 Memorandum Opinion and Order the Court concluded that "[b]ecause Defendants failed to consider an important aspect of the predator damage management program--the cougar population--and failed to address in a meaningful way the information contained in the Logan report regarding the sustainable harvest rate, Defendants' actions were arbitrary and capricious and therefore in violation of NEPA."  (Memo. Op. & Order at 27.)

---

[1] Plaintiffs' Motion for Summary Judgment requested only (1) an order that Defendants had violated NEPA; (2) an order enjoining Defendants from continuing the predator damage management program; and (3) an order enjoining Defendants from further violating NEPA and requiring the preparation of an EIS.  (Memo. in Supp. of Mo. for Summ. J. at 2.)

Because the Plaintiffs had "not shown that the predator damage management program has had a significant effect on the human environment," however, Defendants were not required to prepare an EIS.  *Id*.   The case was remanded in order to allow Defendants to gather the necessary scientific data and conduct the appropriate analysis.  *Id*.  Plaintiffs' request that Defendants be enjoined from killing any more cougars and that they be required to prepare an EIS was denied. *Id*. at 28.

Plaintiffs now request attorneys fees and costs under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d)(1)(A).

**LAW**

Section 2412(d)(1)(A) of the EAJA states that "a court shall award to a prevailing party other than the United States fees and other expenses . . . incurred by that party in any civil action . . . including proceedings for judicial review of agency action . . . unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." "Position of the United States" includes both the position of the United States taken in the civil action and the agency's own action. 28 U.S.C. § 2412(d)(2)(D).

Under the EAJA, "attorney fees shall not be awarded in excess of $125 per hour unless the court determines that an increase in the cost of living or a special factor . . . justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A)(ii). "[T]he district court has discretion in determining the amount of a fee award." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). "It remains important, however, for the district court to provide a concise but clear explanation of its reasons for the fee award." *Id.*

**DISCUSSION**

Plaintiffs argue they are entitled to an award of $34,572.49 for attorneys' fees and other expenses because they are "prevailing parties" under the EAJA.[2] The Government does not dispute that Plaintiffs are prevailing parties.[3] Instead, the Government contends that Plaintiffs are not entitled to an award of attorneys' fees and costs because the United States' position was "substantially justified." Defendants also argue that even if Plaintiffs are awarded fees and expenses, the award "should be substantially reduced due to the limited success of Plaintiffs in this action." (Resp. at 1.)

**Substantially Justified**

The Government "bears the burden of showing that its position was substantially justified." *Estate of Smith v. O'Halloran*, 930 F.2d 1496, 1501 (10th Cir. 1991) (citing *Hadden v. Bowen*, 851 F.2d 1266, 1267 (10th Cir. 1988)). To meet this burden, "the government must prove that its case had a reasonable basis in law and in fact." *Id*. (citing *Hadden*, 851 F.2d at 1267); *see also Pierce v. Underwood*, 487 U.S. 552, 565 (1988). The Tenth Circuit "has held that the government must establish three components to meet this test of reasonableness: a reasonable basis for the facts asserted; a reasonable basis in law for the legal theory proposed;

---

[2] This figure includes fees for preparing the Motion for Attorneys' Fees and Expenses and for replying to Defendants' response.

[3] The Court agrees that Plaintiffs are clearly the "prevailing party" under the EAJA. Although Defendants were not enjoined from killing cougars or ordered to prepare an EIS, Plaintiffs succeeded on a significant issue in this litigation--establishing that Defendants' preparation of the EAs violated NEPA and was arbitrary and capricious. *See Hensley*, 461 U.S. at 433 ("[P[laintiffs may be considered prevailing parties for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.") (internal quotations and citation omitted).

and support for the legal theory by the facts alleged." *Harris v. Railroad Retirement Bd.*, 990 F.2d 519, 520-21 (10th Cir. 1993) (citation omitted). "[A] lack of substantial evidence on the merits does not necessarily mean that the government's position was not substantially justified." *Hadden,* 851 F.2d at 1269.

Defendants argue that their position was substantially justified because "substantial law supported the Defendants' position that the matter was one on which the Court owed deference to the agency," "the Court's determination was based in part on letters that were outside the administrative record," and "the Court agreed with the Defendants' position, not the Plaintiffs', on preparing an EIS and enjoining the agency's longstanding and ongoing predator control program." (Resp. at 3-4.)

Defendants correctly argue that substantial law supports their position that the agency's decision was entitled to deference. However, "position of the United States" includes both the position of the United States taken in the civil action and the *agency's* action. 28 U.S.C. § 2412(d)(2)(D). The Court, in the Memorandum Opinion and Order, determined that the agency's finding that the predator damage management program would not have a significant effect on the human environment was arbitrary and capricious because Defendants failed to consider an important and basic aspect of the issue--the actual cougar population in New Mexico--and because Defendants failed to meaningfully consider the new and relevant information contained in the Logan report. (Memo. Op. & Order at 25.) The Court found Defendants' actions to be arbitrary and capricious under a deferential standard of review, which underscores the fact that the agency's position did *not* have a reasonable basis in law or fact.

Defendants also argue that their position was substantially justified because at the time

they prepared the EAs they did not have Dr. Logan's three letters. This argument is unpersuasive. Defendants had two of Dr. Logan's letters at their disposal before this litigation began and had the third two weeks after Plaintiffs filed their complaint. Nevertheless, Defendants chose to pursue litigation rather than to concede that their preparation of the EAs and FONSIs had violated NEPA.

Furthermore, these letters were considered for the limited purpose of determining whether the agency considered all relevant factors--including evidence contrary to the agency's position--and because consideration of the letters was necessary to explain the technical terms and complex subject matter at issue. (Memo. Opinion at 8.) Dr. Logan's letters did not introduce new data; they merely pointed out how Defendants had misconstrued the findings of the Logan report and had depended on unreliable studies to conclude that the predator damage management program would not have a significant effect on the human environment.[4] Most of the observations and comments contained in the three letters point out what is obvious from studying the NEPA documents themselves. For instance, the April 1997 and May 1997 letters state that there is no data concerning the cougar population and whether it is stable, (Memo. Op. & Order at 16), which the Albuquerque and Las Cruces EAs frankly concede. (Memo. Op. & Order at 11). The May 1998 letter criticizes the Las Cruces EA for relying on a 28% sustainable harvest rate from

---

[4] The three letters include: 1.) a letter dated May 20, 1998, written by Dr. Logan to Alex Larra of WS stating that the FONSI for the Las Cruces WS district reflected misunderstandings regarding the Logan report (Ex. A to Plaintiffs' Memo.); 2.) a letter dated April 18, 1997, from Dr. Logan to Elisabeth Jennings of Sangre de Cristo Animal Protection, Inc. criticizing the Roswell EA's reliance on the Ashman & Robinette studies on cougar populations (Ex. 1 to Reply); and 3.) a letter dated May 6, 1997, from Dr. Logan to Elisabeth Jennings of Sangre de Cristo Animal Protection, Inc. commenting on the 1994 FEIS and the 1997 FONSI for the Roswell district (Ex. 2 to Reply).

the Logan report, but even the Court was able to grasp from reviewing the Logan report that this 28% figure represents the *maximum* sustainable harvest rate under ideal conditions and that the actual sustainable harvest rate is probably much lower. (Memo. Op. & Order at 14-15.) Thus, the fact that Defendants did not have Dr. Logan's letters at their disposal when preparing the NEPA documents does not support the argument that Defendants' position had a reasonable basis in law and fact.

Finally, Defendants contend that because the Court rejected Plaintiff's request that Defendants be ordered to prepare an EIS and be enjoined from killing cougars under the predator damage management program, Defendants' position was substantially justified. Defendants cite no legal authority to support their contention that a court's rejection of some of a plaintiff's requested relief dictates the conclusion that a defendant's position was "substantially justified," (Resp. at 4), and case law suggests the opposite conclusion. In *Southern Oregon Citizens Against Toxic Sprays, Inc. v. Clark*, 720 F.2d 1475, 1481 (9th Cir. 1983), *cert. denied*, 496 U.S. 1028 (1984), a case cited in Defendants' brief, the Ninth Circuit held that the district court erred in finding that the government's position was substantially justified because the plaintiff had succeeded on only one of four legal theories. The court stated that the government's success on specific issues "does not affect the substantial justification of the government's position. The four legal theories advanced by [plaintiffs] were alternative approaches to a single desired remedy, an injunction against further spraying," which the plaintiffs succeeded in obtaining. Therefore, the court stated, "time spent by [plaintiffs] on unsuccessful legal theories may be considered only in determining the amount of an award." *Id*. (citing *Hensley*, 103 S.Ct. at 1493). This case suggests that Defendants' success on some issues in this case should be considered when determining the

-8-

amount of Plaintiffs' EAJA award--not whether Defendants' position was substantially justified.

A review of this case and the January 10, 2000 Memorandum Opinion and Order shows that Defendants have failed to meet their burden of establishing that their case had a reasonable basis in law and fact.  As already discussed, Defendants' actions were found to be arbitrary and capricious because Defendants failed to adequately consider a basic and critical aspect of the effect of the predator damage management program--the actual cougar population in New Mexico and the sustainable harvest rate for cougars.  The EAs based their estimates of the cougar population on a personal comment that was admittedly the product of guessing, (Memo. Op. & Order at 18), and based their conclusion that the population was stable on the unsubstantiated comment of an employee of the New Mexico Game and Fish Department,  (Memo. Op. & Order at 19).  Defendants plucked from the Logan report the highest estimate given of the sustainable harvest rate without providing any meaningful discussion of the other sustainable harvest rates set forth in the report. (Memo. Op. & Order at 23.)  Because Defendants' position had no reasonable basis in law or fact, and because there are no special circumstances that make an award unjust, Plaintiffs are entitled to recover fees and expenses under the EAJA.

**Amount of Award**

Any inquiry into the amount of an award begins with a lodestar figure, which is derived by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate. *See Hensley*, 461 U.S. at 440.[5] Here, Plaintiffs request a total of $34,572.49, which includes $34,198.25 in legal fees and $374.24 in costs. Defendants do not dispute the reasonableness of the number of hours spent, the hourly rates charged, or the costs. Having reviewed the exhibits submitted in connection with Plaintiffs' motion, and having noted that the requested hourly rates does not exceed the EAJA cap of $125 an hour, I conclude that the number of hours expended on the litigation and the hourly rates are reasonable. Plaintiffs' request for costs and expenses is also reasonable.

Defendants cite *Hensley* for the proposition that any fees awarded Plaintiffs should be reduced because they obtained only partial success. Defendants point out that although the Court found that the EAs were inadequate, the Court denied Plaintiffs' request that Defendants be ordered to prepare an EIS and that they be enjoined from killing any more cougars. Because Plaintiffs obtained only one-third of their requested relief, Defendants suggest that a 66% reduction of Plaintiffs' award would be appropriate.

In *Hensley*, the Court stated that if the plaintiff succeeded on only some of its claims, the court should ask two questions. *See Hensley*, 461 U.S. at 434. "First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the

---

[5] Although *Hensley* involved an award of fees under § 1988, courts routinely rely on its analysis in determining fee awards under the EAJA. *See, e.g., Portland Audubon Society v. Lujan*, 865 F. Supp. 1464 (D.Or. 1994) (relying on *Hensley* to define "prevailing party" under the EAJA and to assess whether the overall amount of plaintiffs' EAJA award should be reduced).

plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?" *Id.* The court went on to discuss cases in which a plaintiff's claims "involve a common core of facts" or are "based on related legal theories":

> Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

*Id.* at 435. The Court emphasized that "the most critical factor is the degree of success obtained." *Id.* at 436. Thus, a plaintiff who obtains "excellent results" should fully recover an award of fees even if the "plaintiff failed to prevail on every contention raised in the lawsuit." *Id.* at 435 (citation omitted). On the other hand, if a plaintiff "has achieved only partial or limited success," the lodestar amount "may be an excessive amount." *Id.* at 436. In such a case, the court should consider reducing the award. *See id.* at 440 ("A reduced fee award is appropriate if the relief, however significant, is limited in comparison to the scope of the litigation as a whole.").

Here, Plaintiffs' claims all involve the predator damage management program and whether Defendants' preparation of the EAs and FONSIs violated NEPA. Therefore, Plaintiffs' claims "involve a common core of facts" and are "based on related legal theories." *Id.* at 435. This makes it virtually impossible to divide the hours expended by Plaintiffs' counsel among those spent arguing that the EAs were inadequate, that an EIS should be prepared, and that Defendants should be enjoined from killing cougars.[6] Consequently, this court must "focus on the

---

[6] The time sheets for Plaintiffs' counsel also do not break down their hours according to time spent advocating for new EAs, for an order requiring an EIS, and for an order enjoining the killing of any more cougars.

significance of the overall relief obtained by the plaintiff[s] in relation to the hours reasonably expended on the litigation." *Id*.

Although Plaintiffs claim they have achieved "excellent results," this characterization overlooks the fact that not all of Plaintiffs' requested relief was granted. Because Plaintiffs have achieved only partial success, their award should be reduced. *See Hensley*, 461 U.S. at 440. Plaintiffs' award should not, however, be reduced using the mathematical formula proposed by Defendants because the Supreme Court has disapproved of this approach. *See Hensley*, 461 U.S. at 435 n. 11 (rejecting "a mathematical approach comparing the total number of issues in the case with those actually prevailed upon"). In *Hensley* the Court stated:

> There is no precise rule or formula for making these [fee] determinations. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment. This discretion, however, must be exercised in light of the considerations we have identified.

*Id*. at 436-37.

Applying *Hensley*, other courts have rejected arguments, like the Defendants', that an EAJA award should be reduced in direct proportion to the number of claims on which the plaintiff prevailed. *See Smith v. Brown*, 8 Vet. App. 327 (Vet. App. 1995). In *Smith*, the government argued that a veteran's EAJA award should automatically be reduced by one-third because he had prevailed on only two of his three claims. *Id*. at 330. The court rejected this argument on the ground it "would directly contradict the Supreme Court's admonition in *Hensley* that a 'mathematical approach' is to be avoided." *Id*. (citation omitted). The court found that the claim on which the veteran had prevailed was closely related to one on which he had lost and that,

therefore, the claims were "the sort of 'related claims' that *Hensley* contemplates, i.e., where in doing work on one of the claims, an attorney is effectively doing work for another one as well." *Id*. Consequently, the court concluded that the claims were "related for EAJA-fee-reduction purposes." *Id*. Finding that the veteran had obtained "significant--but not complete--relief overall," the court determined that the EAJA award should be reduced by 5%.

Here, Plaintiffs obtained significant, albeit incomplete, relief. They succeeded in establishing that Defendants preparation of the EAs and FONSs violated NEPA, and Defendants were ordered on remand to "gather the necessary scientific data and conduct the required scientific analysis." (Memo. Op. & Order at 27; quotations and citation omitted.) Other courts have recognized the unique nature of environmental cases and concluded that plaintiffs' success in these case must be evaluated accordingly:

> "[A]ny determination as to what constitutes 'success' in environmental litigation must take into account that many environmental laws mandate 'procedures' rather than 'results.' Indeed, environmental litigation is generally undertaken to force the relevant agency to properly perform its statutory responsibilities. Thus, although a remand may appear to be a hollow procedural victory in another context . . . it is of considerably more significance in the environmental context.

*Golden Gate Audobon Soc. v. U.S. Army Corps of Eng.*, 732 F. Supp. 1014, 1023 n.13 (N.D. Cal. 1989) (refusing to reconsider its finding that plaintiffs were prevailing parties).

Plaintiffs succeeded in forcing Wildlife Services to properly perform its statutory responsibilities under NEPA. While the Court rejected Plaintiffs' request that Wildlife Services be ordered to prepare EISs for the predator damage management program, one of the reasons for this denial was that the Court could not determine, without more accurate information about the

-13-

cougar population and the sustainable harvest rate, whether the predator damage management program significantly affected the quality of the human environment. (Memo. Op. & Order at 26.) Thus, the Plaintiffs failed to succeed on their EISs argument in part because the Defendants' preparation of the EAs and FONSIs was so inadequate.

It is most difficult to determine by how much Plaintiffs' fee award should be reduced. As discussed, the time sheets submitted by Plaintiffs' counsel do not identify how much time was spent on Plaintiffs' successful argument that the preparation of the EAs and FONSIs violated NEPA and how much time was spent on Plaintiffs' unsuccessful arguments that the Court should order Defendants to prepare an EIS and enjoin the killing of any more cougars until Defendants complied with NEPA. As the Court acknowledged in its Memorandum Opinion and Order, the Plaintiffs' arguments overlap regarding the inadequacy of the EAs and the need for preparation of EISs. (Memo. Op. & Order at 6.)

Most of the work Plaintiffs' did on this case, including drafting the complaint and preparing their motion for summary judgment, would have been necessary to prevail on Plaintiffs' argument that the EAs and FONSIs were inadequate. Consequently, only a minimal percentage of Plaintiffs' work was directed solely towards developing their unsuccessful claims. For instance, just a few paragraphs of Plaintiffs' twenty-three page complaint can be identified as containing allegations concerning only the need for an EIS and an injunction to stop killing cougars.[7] Only a single paragraph of Plaintiffs' twenty-one page brief in support of its motion for

---

[7] Count I alleges both that the FONSIs and EAs were inadequate and that Defendants should be required to prepare an EIS. (Compl. at 16.) Count IV is directly solely at the request that Defendants be ordered to prepare an EIS. Of the thirteen paragraphs comprising their request for relief, only two paragraphs address the request that Defendants be ordered to prepare an EIS and be enjoined from killing cougars. (Compl. at 23.)

summary judgment is devoted to the argument that injunctive relief is appropriate. (Memo. at 20.) A mere three pages of Plaintiffs' brief address the general argument that an EIS must be prepared. (Memo. at 11-14.)

Having carefully reviewed the complaint, the briefs, and the pleadings, and recognizing that there is "no precise rule or formula for making these [fee] determinations," *Hensley*, 461 U.S. at 436, I conclude that Plaintiffs' fee award should be reduced by 10%. This figure represents an approximation of the time Plaintiff's counsel spent developing unsuccessful arguments.

IT IS THEREBY ORDERED that:

1. Plaintiffs' Motion for Attorneys' Fees and Expenses Pursuant to the Equal Access to Justice Act, (Doc. No. 27) is GRANTED IN PART;

2. Plaintiffs' request for attorneys' fees in the amount of $34,198.25 is reduced by 10%, ($3,419.83);

3. Plaintiffs are awarded a total of $30,778.42 for attorneys' fees; and

4. Plaintiffs are awarded $374.24 in costs.

*[signature: James A. Parker]*

UNITED STATES DISTRICT JUDGE